**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

_____
)
**WATERFORD INVESTMENT SERVICES,**            )
**INC.,**                                                                    )
)
       **Plaintiff,**                                                  )
)
       **v.**                                                              )          **CIVIL NO. 3:10cv548-REP**
)
**LOUIS BOSCO, et al.,**                                       )
)
       **Defendants.**                                          )
_____)

## REPORT AND RECOMMENDATION

        This matter is before the Court for a report and recommendation pursuant to 28 U.S.C.

§ 636(b)(1)(B) on the parties' cross motions for summary judgment.  (Docket Nos. 16, 18.)  The

relevant issues have been thoroughly briefed and the parties have submitted the motions for

resolution without the necessity of oral argument.  For the reasons set forth herein, it is the

Court's recommendation that the Defendants' Motion for Summary Judgment be GRANTED,

and that the Plaintiff's Motion for Summary Judgment be DENIED.

## I. BACKGROUND

        Waterford Investment Services, Inc. ("Waterford" or "Plaintiff") initiated the action

seeking a declaratory judgment and injunctive relief against a group of investors, including Louis

Bosco, his wife, and others ("Defendants"), who had previously filed a claim with the Financial

Industry Regulatory Authority ("FINRA"), seeking arbitration of a dispute between Waterford

1

and Defendants.[1]  (Compl. at ¶ 41.)  Waterford seeks a declaratory judgment that it has no duty

to arbitrate any claim with Defendants, an injunction enjoining the now-pending FINRA

arbitration, and injunctive relief prohibiting Defendants' attorneys from prosecuting any

arbitration proceedings against Waterford in any forum.  (Compl. at 18.)  Defendants seek to

have this Court deny Waterford the relief it seeks, and that it order Waterford to arbitrate the

dispute pursuant to FINRA Rules and the Federal Arbitration Act, 9 U.S.C. §§ 1-307.  (Answer

at 17.)  Alternatively, Defendants seek a finding that Waterford is a successor in interest to

Community Bankers Securities, LLC ("CBS") and, as such, is contractually bound to arbitrate

Defendants' claim in FINRA arbitration.  (Id.)  Both parties also request an award of their

attorney's fees and costs associated with the matter.  (Compl. at 18; Answer at 17.)[2]

        At the initial pretrial conference with this Court, counsel agreed to stipulate the

applicable facts and to submit the issues on cross motions for summary judgment.  (Order, Jan.

28, 2011.) The Court has reviewed each party's statement of undisputed facts, including the

extensive supporting documentation filed in support of the respective positions.  Reserving

discussion of disputed material facts that must be treated separately as to each motion, *infra*, as

required where the parties have submitted cross-motions for summary judgment, see Rossignol

v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (citations omitted),  the Court concludes that the

following narrative represents the relevant facts for purposes of resolving the pending  cross-

motions for summary judgment.

---

[1] Until recently, FINRA was known as NASD (National Association of Securities Dealers).
Cases cited in this opinion may refer to either organization, and the names may be used
interchangeably.  See Royal Alliance Assocs., Inc. v. Branch Ave. Plaza, L.P., 587 F. Supp. 2d
729, 731 n.1 (E.D. Va. 2008).

[2] Neither party has identified any legal basis for its attorney's fees.  Accordingly, the Court
refrains from addressing the issue at this time, but without prejudice to the prevailing party
subsequently filing a well-supported petition for fees pursuant to Fed. R. Civ. P. 54(d)(2).

Waterford is a Florida corporation, formed in 1998, with its main office located in

Clearwater, Florida, with additional offices in Tinley Park, Illinois and Richmond, Virginia.

(Compl. at ¶ 1.)  CBS was formed in February, 2003 as a Virginia limited liability company

engaged in the trading of securities.  (Id. at ¶ 24.)  CBS's main office was located in Richmond,

Virginia.  (Id. at ¶ 25.)  Although CBS still exists and is in good standing with the Virginia State

Corporation Commission, it no longer transacts any business.  (Id. at ¶ 26.)  Waterford and CBS

are both majority-owned by AIC, Inc, which is a Virginia corporation.  (Id. at ¶¶ 5, 27.)  AIC

acquired a majority interest in CBS in 2003 (Id. at ¶ 27), and currently owns more than 75% of

Waterford.  (Id. at ¶ 5.)  In 2009, AIC owned 90% of Waterford and 88% of CBS.  (Def.'s Br.

Sup. Mot. Sum. J. ("Def's Br.") at ¶ 11.)[3]  CBS is currently registered as a securities broker-

dealer with the Securities and Exchange Commission (SEC), and was registered with FINRA

from July 8, 1997 until February 16, 2010, when it ceased conducting business.  (Compl. at ¶

---

[3] Local Rule 56 requires the parties in a motion for summary judgment to "include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute. In resolving a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." E.D. Va. Loc. R. 56(B).  Waterford has departed from Local Rule 56 at various points, offering a general restatement of facts, as opposed to a "specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute," as required.  Id.  For example, Defendants assert that AIC owned 90% of Waterford and 88% of CBS in 2009.  (Def's Br. at ¶ 11.)  Waterford does not deny this, and says merely that AIC owned "over 75% of Waterford and "a majority" interest in CBS.  (Pl.'s Br. Sup. Mot. Sum. J. ("Pl.'s Br.") at ¶¶ 1, 18.)  Waterford's assertion is consistent with Defendants' assertion, though less specific.  In this case, the Court will accept Defendants' assertion as an undisputed fact.  This Court has made all reasonable efforts to search the record in an attempt to identify those facts that are genuinely undisputed, but to the extent that Waterford's responses to Defendants' claims are vague or not reasonably identifiable, the Court reserves the right to consider Defendants' statement of the facts as undisputed, as permitted pursuant to the Local Rule.  See also Fed. R. Civ. P. 56(e).

29.)  Waterford, however, remains registered with the SEC as a securities broker-dealer and has

been a member of FINRA since March 17, 1999.  (Id. at ¶¶ 14-15.)

Defendants' complaints against Waterford have their origin in some investment advice

Defendants received from one George Gilbert ("Gilbert"), who at the relevant time was an

independent contractor and sales representative for CBS.  Although Gilbert is currently an

independent contractor with Waterford, he had no employment or other direct contractual

relationship with Waterford during the time in question.  When CBS ceased doing business in

December, 2009, after it had started to receive notice of FINRA arbitration claims filed against it

in September and November of 2009 (Def.'s Br. at ¶ 20-21.), Richard Landi, the then-Vice

President of Operations for both Waterford and CBS, offered to Gilbert and a number of other

CBS representatives the opportunity to transfer their representation from CBS to Waterford.

Gilbert accepted, and has since that time served as an independent contractor and sales

representative for Waterford.  (Pl.'s Br. at ¶ 57; Gilbert Affidavit, Docket No. 16-2, at ¶ 34.)

Between 2005 and 2009, Gilbert, while a registered representative of CBS, advised

Defendants to acquire certain investments.  (Pl.'s Br. at ¶¶ 34-45.)  Defendants assert that these

recommended investments were nothing more than fraudulent, so-called "Ponzi schemes."[4]

(Def.'s Br. at 2.)  Although Defendants do not claim that Gilbert, CBS, or Waterford were

directly involved in the allegedly fraudulent schemes, or that they had knowledge of any fraud

---

[4] A Ponzi scheme is a fraudulent investment scheme in which money contributed by later
investors generates artificially high dividends or returns for the original investors, whose
example attracts even larger investments.  Money from the new investors is used directly to
repay or pay interest to earlier investors, usually without any operation or revenue-producing
activity other than the continual raising of new funds. This scheme takes its name from Charles
Ponzi, who in the late 1920s was convicted for fraudulent schemes he conducted in Boston.
Black's Law Dictionary 1198 (8th ed. 2004).  For purposes of resolving the question of
arbitrability, the Court draws no conclusions as to whether the subject transactions constituted
such a scheme.

involved, Defendants assert that Gilbert and CBS failed to perform a due-diligence investigation on the investments, that Gilbert and CBS made various misrepresentations and omissions with respect to the investments (e.g., by describing the risky investments as "safe," and generally failing to disclose risk and advise Defendants on how to reduce risk), and that Gilbert and CBS sold to Defendants investment products that were grossly unsuitable for Defendants' particular needs and resources.  (Def's Br. at 2-3.)  Problems with the investments began to occur in August, 2008 (Pl.'s Br. at ¶¶ 46-47), and Defendants claim that, by the end of 2009, they had lost much of their life savings as a result of the suspect investments.  (Def.'s Br. at 3.)  Defendants seek damages of $1,107,000.00 in their FINRA Statement of Claim.  (Id. at ¶ 4.)

Attempting to avoid FINRA arbitration, Waterford emphasizes certain facts involving its relationships with CBS and Gilbert: The two officers responsible for the day-to-day operations of Waterford have never had any contact or dealings with Defendants (Compl. at ¶¶ 7-8); CBS and Waterford maintained at least some separate officers, directors, and employees, along with separate records, separate customer accounts, and separate business telephone and fax numbers (Id. at ¶ 32); Waterford did not purchase any assets from CBS upon the latter's cessation of business operations (Id. at ¶ 33); CBS and Waterford filed separate tax returns and made separate disclosures and filings with the SEC (Id. at ¶ 35); Waterford and CBS maintained corporate formalities throughout their existence (Pl.'s Br. Opp'n to Def's Mot. Sum. J. ("Pl.'s Opp'n") at ¶ 13); Gilbert was not an employee or independent contractor with Waterford at the time of his alleged wrongful conduct (Compl. at ¶ 52); between April, 2004 and December 23, 2009 Gilbert worked exclusively for CBS pursuant to the terms of his "Independent Associate Agreement," and he reported exclusively to CBS operations and compliance personnel.  (Pl.'s Opp'n at ¶ 9.)

Defendants, by contrast, emphasize the significant overlap in directors, officers, and employees of Waterford and CBS.  (Def.'s Br. at ¶ 12-15.)  Defendants also note each company's practice of sharing office space and equipment in their Richmond office (Def's Br. at ¶ 16-19), along with AIC's joint ownership of the two companies.  (Id. at ¶ 11.)  Defendants, in their efforts to convince the Court to compel arbitration, also appeal to the language of FINRA's by-laws and Congress's stated preference for arbitration as opposed to litigation, as expressed in the Federal Arbitration Act, combined with the Supreme Court's directive that, in interpreting an arbitration agreement, any ambiguities or doubts should be resolved in favor of arbitration. Misubishi Motors Corp. v. Soler Chrylser-Plymouth, 473 U.S. 614, 626 (1985).  Alternatively, Defendants argue that Waterford is a successor-in-interest to CBS under Virginia State law, and, as such, is obligated to submit to FINRA arbitration with Defendants.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A "genuine issue of material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  Thus, the court must view the record in the light most favorable to the nonmoving party, and must draw all reasonable inferences in its favor.  See Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002).  However, "the mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." Anderson, 477 U.S. at 252; see also Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008).  Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must be material to

an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." Thompson v. Everett, Inc. v. Nat'l Cable Adver., LP, 57 F.3d 1317, 1323 (4th Cir. 1995).

### III. DISCUSSION

The United States Supreme Court has determined that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) (quoting Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582 (1960)). In simple terms, Waterford's position is that it has never had any direct dealings with Defendants and, thus, it could not have agreed to arbitrate any disputes with them. (Compl. at ¶ 61; Pl.'s Br. at 18-20.) Defendants respond that Waterford has a contractual duty to submit to FINRA arbitration in virtue of its FINRA membership, together with Defendants' status as "customers" pursuant to FINRA by-laws. Defendants offer two main arguments in support of their position. First, they argue that the FINRA by-laws, properly construed, require Waterford to submit to arbitration with Defendants, regardless of whether Waterford is a successor-in-interest to CBS. Second, and alternatively, Defendants argue that Waterford is, in fact, a successor in interest to CBS, and because CBS would have been obligated to enter FINRA arbitration, the duty to arbitrate is assumed by Waterford.

### A.      Defendants' Appeal to the Language of the FINRA By-Laws

Defendants' first main argument appeals to the plain meaning of the FINRA by-laws, and can be considered as consisting of two sub-arguments, one based on FINRA Rule 12413 and the other on Rule 12200. This Court finds neither of the arguments persuasive, as the Court

discusses in turn.  However, the Court finds a third, more persuasive reason for finding a duty to arbitrate against Waterford, based on Rule 12200.

### 1.     Defendants' appeal to FINRA Rule 12413

Defendants argue that the question of whether the dispute between Defendants and Waterford should be arbitrated is, itself, a question for the FINRA arbitrator to answer.  (Def.'s Br. at 8-10.)  Defendants concede that questions of arbitrability are normally for courts, and not arbitrators, to decide.  (Id. at 9.)  However, Defendants note an exception to the general rule, recognized by the Supreme Court in Howsam: "The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the '*question of aribitrability*,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'"  537 U.S. at 83 (emphasis in original) (quoting AT&T Techns., Inc. v. Commc'ns Workers, 475 U.S. 643, 649 (1986)).  Defendants appeal to FINRA Rule 12413, which provides that, "[t]he panel has the authority to interpret and determine the applicability of *all provisions* under the Code.  Such interpretations are final and binding upon the parties" (emphasis added).

Defendants argue that Rule 12413 constitutes clear and unmistakable evidence that Waterford agreed to have questions of arbitrability resolved by a FINRA arbitrator.  Although Defendants are correct that the language of Rule 12413 is quite broad, this Court is not persuaded that it constitutes *clear and unmistakable* evidence of an agreement to submit questions of arbitrability only to the arbitrator.   In Howsam, the Court distinguished between issues of procedural and substantive arbitrability, suggesting that arbitrability questions are most appropriately presented to the arbitrator when there is no dispute of the provisions of an

8

arbitration agreement between the parties, but where there is only some procedural issue. 537 U.S. at 84-85.

Allowing an arbitrator to decide substantive issues, such as whether there was ever an agreement to arbitrate, involves "the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate." Id. at 83-84. See also First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995). In the present case, what is at issue is not a mere procedural matter, such as whether Defendants filed a timely complaint with FINRA, or whether some other defense to arbitrability such as waiver is available. Instead, the issue before the Court is whether there was ever any agreement for binding arbitration between Waterford and Defendants in the first instance. While a party could reasonably expect procedural issues such as time limits, notice, laches, and estoppel to be resolved by an arbitrator, Waterford could not reasonably expect to be forced into arbitration by Defendants solely on the basis of FINRA Rule 12413. To do so would impinge on Waterford's due process rights. Howsam, 537 U.S. at 85. See also Wheat, First Sec., Inc. v. Green, 993 F.2d 814, 820 (11th Cir. 1993).

This case is not the first time that this Court has considered such an appeal concerning Rule 12413. In Royal Alliance Associates, Inc. v. Branch Avenue Plaza, L.P., the Court also rejected the defendant's argument that the language of FINRA Rule 12413, by itself, constituted clear and unmistakable evidence that the parties agreed to submit the question of arbitrability to the FINRA arbitrator. 587 F. Supp. 2d 729, 734-35 (E.D. Va., 2008). The Court noted that, while the Fourth Circuit has not considered the scope of Rule 12413, "the majority of the Courts of Appeals that have considered this issue have held that this broad language, by itself, does not 'clearly and unmistakably' empower arbitrators to determine the question of arbitrability." Id. at

735.  See John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 55 (2d Cir. 2001) (holding that one

party's membership in NASD, and the resulting requirement that it adhere to the above rule, does

not clearly and unmistakably submit questions of arbitrability to arbitrators); Miller v. Flume,

139 F.3d 1130, 1134 (7th Cir. 1998) (holding that the subject rule does not constitute a clear and

unmistakable grant of power to arbitrators to decide questions of arbitrability); Smith Barney,

Inc. v. Sarver, 108 F.3d 92, 96-97 (6th Cir, 1997) (same); Cogswell v. Merrill Lynch, Pierce,

Fenner & Smith, Inc. v. Cohen, 62 F.3d 381, 384 (11th Cir. 1995) (same).  But see, FSC Secs.

Corp. v. Freel, 14 F.3d 1310, 1312, (8th Cir. 1994) (holding that this language is, in fact, "clear

and unmistakable"); PaineWebber Inc. v. Elahi, 87 F.3d 589, 601 (1st Cir. 1996) (noting that the

language in this rule "strongly undercuts" arguments that a separate section of the NASD rules

was an arbitrability issue that should be decided by courts and not arbitrators).

Especially in light of the due process concerns articulated by the Supreme Court in

Howsam and First Options, it is the recommendation of this Court that the trial court should join

the Court in Royal Alliance in adopting the majority view of the Circuit Courts that FINRA Rule

12413, *by itself*, does not clearly and unmistakably grant arbitrators the authority to decide

questions of arbitrability.  Therefore, the Court recommends that Defendants' motion for

summary judgment be denied only to the extent that it relies on such a basis.

**2.      Defendants' appeal to Rule 12200**

Defendants also offer an argument based on FINRA Rule 12200, independent of its

claims based on Rule 12413.  (Def's Br. at 10-13.)  Defendants argue that the "plain language"

of Rule 12200 makes it clear that the FINRA Arbitration Rules require Waterford to arbitrate the

issues raised in Defendants' FINRA Statement of Claim.  (Id. at 10, 13.)  Rule 12200[5] provides

as follows:

> 12200.  Arbitration Under an Arbitration Agreement or the Rules of FINRA
>
> The Customer Code applies to claims filed on or after April 16, 2007.  In addition, the list selection provisions of the Customer Code apply to previously filed claims in which a list of arbitrators must be generated after April 16, 2007; in these cases, however, the claim will continue to be governed by the remaining provisions of the old Code unless all parties agree to proceed under the new Code.
>
> Parties must arbitrate a dispute under the Code if:
>
> - Arbitration under the Code is either
>
>   (1) Required by a written agreement, or
>
>   (2) Requested by the customer;
>
> - The dispute is between a customer and a member or associated person of a member; and
>
> - The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

To satisfy the first prong of the Rule, Defendants rely on the Fourth Circuit's decision in

Washington Square Securities, Inc. v. Aune, 385 F.3d 432 (4th Cir. 2004), in which the court

ruled that "[t]he NASD Code constitutes an 'agreement in writing' under the Federal Arbitration

Act."  (Def.'s Br. at 10.)  To satisfy the second prong, Defendants point to FINRA's definition of

"customer": "A customer shall not include a broker or dealer."  FINRA Rule 12100(i).  Because

Defendants are neither brokers nor dealers, Defendants argue, they must therefore be considered

to be customers.  To satisfy the third prong, Defendants emphasize the change in registration of

---

[5] FINRA by-laws are available at http://www.finra.org/Industry/Regulation/index.htm (last visited July 26, 2011).

CBS's registered representatives to Waterford upon termination of CBS, and Waterford's alleged status as successor-in-interest to CBS.  (Id. at 11.)

This Court rejects Defendants' interpretation of the second prong of Rule 12200.  In support of their expansive definition of "customer," Defendants appeal to the Fourth Circuit's decision in Aune, which recognized a federal policy favoring arbitration by which the presumption of arbitrability should not be overridden "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage."  Aune, 385 F.3d at 435-36.  Although the language in Aune makes clear the Fourth Circuit's recognition of a liberal federal policy in favor of arbitration, Defendants' construal of the language of Rule 12200 is implausible on its face and in conflict with relevant case law.

Defendants' reading of "customer" for purposes of Rule 12200 would allow any customer of a FINRA member to compel arbitration against *any other* FINRA member, regardless of whether there had been any relationship or contact between the parties.  As Waterford suggests, Defendants' expansive reading of "customer" would allow the Defendants to compel arbitration not only against Waterford, but also against, for example, Goldman Sachs or any other FINRA member, regardless of the lack of any relationship or interaction between Defendants and Goldman Sachs.  (Pl.'s Br. at 18.)

Defendants' interpretation of Rule 12200 is also at odds with relevant case law.  For example, the Court in Royal Alliance recently considered the same argument and rejected it, noting that "[n]umerous courts have held that under the applicable FINRA (or NASD) rules, a customer of a firm whose assets are subsequently acquired by another firm may *not* compel the

12

successor firm to arbitrate a dispute if…the events giving rise to the claim occurred before the acquisition."  Royal Alliance, 587 F. Supp. 2d at 736 (citations omitted).  If being a customer of *some* FINRA member were enough to allow one to force *any* FINRA member into arbitration, it would contradict the existing precedent.

Defendants appeal to the Aune decision in support of their interpretation of Rule 12200, but that case does not support such an expansive reading of "customer."  In Aune, there was some putative relationship between the investors and the NASD member – specifically, the investors dealt directly with a representative who was employed and authorized by the NASD member to sell securities on its behalf, though the representative was also free to participate in business ventures unrelated to the NASD member, and the member was unaware that the broker was selling the investment products at issue.  Aune, 385 F.3d at 433.  Under Defendants' argument, such a relationship is irrelevant.  Moreover, the court in Aune affirmed the lower court's order compelling arbitration mainly on the basis of the broker's status as an *associated person* of the NASD member.  The investors were customers of the broker, and the broker was employed by the NASD member.  Thus, under NASD's counterpart to FINRA Rule 12200, the investors could compel the NASD member to engage in arbitration because they were customers of an associated person of the member, not because they were customers of any *arbitrary* NASD member.  Id. at 436.  See FINRA Rule 12200.

### 3.    Defendants were customers of Gilbert, an associated person of Waterford.

In opposing Defendants' appeal to the supposed "plain meaning" of the language of FINRA Rule 12200, Waterford contends that it had no control over CBS or Gilbert, and that compelling Waterford to arbitrate with Defendants would be analogous to forcing Goldman

13

Sachs – a company with no ties whatsoever to Gilbert, CBS, Waterford, or Defendants – into arbitration with Defendants, simply by virtue of Goldman Sachs's membership in FINRA. While this Court agrees that mere membership in FINRA is not sufficient to compel arbitration, it cannot help but notice the significant distinctions between Waterford and Goldman Sachs vis-à-vis CBS.  It is undisputed that there was significant "overlap" between Waterford and CBS with respect to directors, officers, and employees.  It is also undisputed that Waterford and CBS shared office space in Richmond, Virginia during the time in question, and that the two companies shared a common owner in AIC.  It is also undisputed that Gilbert was a registered representative of CBS, and that Defendants were his customers.  Accordingly, it is undeniable that Waterford, CBS, and Gilbert were, *in some sense*, associated with one another in a way that CBS, Gilbert, and Goldman Sachs never were.

Defendants' appeal to Rule 12200 is ultimately based on the interpretation of the second prong of that Rule which requires arbitration when "the dispute is between a customer and a member *or associated person of a member*" (emphasis added).  It is undisputed that Defendants were never direct customers of Waterford; rather, they were customers of Gilbert.  However, if Gilbert was an associated person of Waterford at the time of the subject transactions, then Rule 12200 requires that Waterford arbitrate with Defendants, assuming that the other two prongs of Rule 12200 are satisfied.  The Court concludes that the other two prongs are satisfied, which leaves only the issue of the proper interpretation of the second prong of Rule 12200, to address, specifically the question of whether Gilbert was an associated person with Waterford.

14

### a.      "Customer" Pursuant to FINRA

The term "customer" has never been clearly or adequately defined in the by-laws of

FINRA (or its predecessor, NASD), and not surprisingly, there has been extensive litigation in

which courts have been called upon to determine whether a given investor was a "customer" of a

FINRA member or a customer of an "associated person."  Deborah F. Buckman, "Who Is

'Customer' for Purposes of National Association of Securities Dealers (NASD) Rule Requiring

NASD Member to Arbitrate any Dispute Between Customer and Member," 16 A.L.R. Fed.2d

231 (2007), § 2.  According to a scholarly survey of such litigation:

> [t]he majority of cases exploring the definition of "customer" have found
> purported customers to meet the definitional requirements for compelling
> arbitration.  Many courts have so held despite the lack of any customer accounts
> opened with a firm or a firm's knowledge of the investments at issue.  The
> majority of cases on this issue have involved investors dealing directly with
> registered representatives ("associated persons" under NASD nomenclature)
> without the knowledge of the broker firms with which they were associated.

Buckman, 16 A.L.R. 231 §§ 2, 5.  Thus, under the approach utilized by most courts, Gilbert

would be found to be an associated person of *CBS*, and Gilbert's customers would therefore be

treated as customers of CBS for purposes of FINRA Rule 12200.

### b.      "Associated Person" Pursuant to FINRA

However, the question of whether Gilbert was an *associated person* of Waterford in

2009, pursuant to FINRA Rule 12200 remains unresolved.  The Court is unaware of any case in

which a court has ruled on the relationship between a registered representative of one FINRA (or

NASD) member and its "sister" company, that is also a FINRA member.  See generally,

Buckman 16 A.L.R. Fed.2d 231.  Nevertheless, the Court concludes that binding precedent from

the Supreme Court and the Fourth Circuit, the latter being appellate authority governing this

Court, makes it clear that Gilbert was an associated person of Waterford, pursuant to FINRA

Rule 12200, due to his being *indirectly controlled* by Waterford, and that Waterford must,

therefore, submit to arbitration with Defendants.

### i.    Interpreting FINRA Terms within the Bounds of <u>Howsam</u>

The United States Supreme Court has recognized a "liberal federal policy favoring

arbitration agreements." <u>Howsam</u>, 537 at 83 (quoting <u>Moses H. Cone Memorial Hospital v.</u>

<u>Mercury Constr. Corp.</u>, 460 U.S. 1, 24-25 (1983)). However, the Court has also recognized an

exception to this policy, in that the question of whether a given dispute is arbitrable at all is for a

court, and not an arbitrator, to decide. In <u>First Options of Chicago</u>, the Supreme Court held that

a court should not assume a presumption in favor of arbitration in determining whether

Waterford is obligated to arbitrate with Defendants pursuant to FINRA Rule 12200:

> Courts should not assume that the parties agreed to arbitrate arbitrability unless
> there is "clea[r] and unmistakabl[e]" evidence that they did so. (Citations
> omitted.) In this manner the law treats silence or ambiguity about the question
> "*who* (primarily) should decide arbitrability" differently from the way it treats
> silence or ambiguity about the question "*whether* a particular merits-related
> dispute is arbitrable because it is within the scope of a valid arbitration
> agreement" – for, in respect to this latter question the law reverses the
> presumption.

<u>First Options of Chicago</u>, 514 U.S. at 944-45.

Waterford could argue that such language demonstrates that the liberal federal policy in

favor of arbitration should not apply in this case, where what is at issue is whether there is any

sort of agreement at all between Waterford and Defendants to arbitrate. With such an argument,

the presumption in favor of arbitration applies only in interpreting the *scope* of an already-

established arbitration agreement, and it is therefore inappropriate to employ the presumption in

favor of arbitration in deciding whether Rule 12200 obligates Waterford to arbitrate with Defendants.

Such an argument is not implausible on its face, but it is clearly incompatible with the Fourth Circuit's decision in <u>Aune</u>.  The facts of <u>Aune</u> are similar to those in the present case – investors bought investment products from a broker who was a representative of an NASD member, though there was no contact or interaction between the investors and the NASD member.  In <u>Aune</u>, the lower court had found that there was no presumption in favor of arbitration, because the investors and the NASD member had never directly entered into an agreement with one another to arbitrate.  <u>Aune</u>, 385 F.3d at 434.  However, the Fourth Circuit reversed the lower court, ruling that the presumption in favor of arbitration *did* apply to the interpretation of the terms "customer" and "associated member" in the NASD Code.

In <u>Aune</u>, the Court interpreted NASD Rule 10301(a), which does not differ materially from FINRA Rule 12200.  <u>See</u> <u>Aune</u>, 385 F.3d at 435.  The Court found that the NASD Code constituted an "agreement in writing" as authorized by the Federal Arbitration Act, 9 U.S.C. § 2, which bound the member (Washington Square), as an NASD member, to submit an eligible dispute to arbitration upon a customer's demand.  <u>Id.</u>  Because the agreement bound Washington Square, the only remaining issue was whether the investors were "customers" whose dispute fell within the scope of NASD Rule 10301(a).  <u>Id.</u>  In effect, the Court found that Washington Square's NASD membership committed it to arbitration pursuant to the NASD Code, and then the Court proceeded to examine the scope of that provision, in particular the terms "customer" and "associated person."  In doing so, the Court relied on the liberal federal policy in favor of arbitration in finding that the investors and the broker were, indeed, customers and an associated

person of Washington Square, respectively.  Thus, the Fourth Circuit satisfied the Supreme

Court's demand that courts, and not arbitrators, determine whether a given dispute is arbitrable in

the first place, while still honoring the liberal federal policy preference in favor of arbitration

over litigation.

This Court concludes that it is appropriate to apply the Fourth Circuit's analysis from

Aune to the present case.  It is undisputed that Waterford is a FINRA member, and that FINRA

requires its members to arbitrate with its customers, and with customers of associated persons.

According to the Aune court, "[t]he examination of the scope of an arbitration agreement is

primarily a task of contract interpretation.  'As with any other contract, the parties' intentions

control.'"  Aune, 385 F.3d at 435 (quoting Misubishi Motors Corp. v. Soler Chrylser-Plymouth,

473 U.S. 614, 626 (1985)).  The court continues:

> Nevertheless, in applying general state law principles of contract interpretation to
> the interpretation of an arbitration agreement within the scope of the [Federal
> Arbitration] Act, due regard must be given to the federal policy favoring
> arbitration . . . Pursuant to this policy, the parties' intentions are generously
> construed as to issues of arbitrability, and *any ambiguities as to the scope of the
> arbitration clause itself must be resolved in favor of arbitration*.  There is a
> presumption in favor of arbitrability in the sense that an order to arbitrate the
> particular grievance should not be denied unless it may be said with positive
> assurance that the arbitration clause is not susceptible of an interpretation that
> covers the asserted dispute.  *Doubts should be resolved in favor of coverage*.  In
> the absence of any express provision excluding a particular grievance from
> arbitration, . . . only the most forceful evidence of a purpose to exclude the claim
> from arbitration can prevail, particularly when, as here . . . the arbitration clause
> [is] quite broad.

Aune, 385 F.3d at 436 (emphasis added) (citations and internal quotation marks omitted).  Thus,

the Fourth Circuit Court of Appeals has made clear the seriousness with which it treats

Congress's stated preference for arbitration, as manifested in the Federal Arbitration Act.

### ii.  Scope of "Associated Person"

It is appropriate to also interpret the FINRA Code in light of the Fourth Circuit's analysis in <u>Aune</u>.  The second prong of FINRA Rule 12200 requires that the "dispute [be] between a customer and a member or associated person of a member."  It is undisputed that Defendants were not direct customers of Waterford, and were instead customers of Gilbert, who was an independent contractor and registered representative of CBS.  FINRA Rule 12100 offers a series of definitions of terms used throughout the Code.  Its definition of "customer" merely consists of the following: "A customer shall not include a broker or dealer."  FINRA Rule 12100(i).  There has been no suggestion that Defendants are, or ever were, brokers or dealers.

The Code also defines "associated person" as follows: "The term 'associated person' or 'associated person of a member' means a person associated with a member, as that term is defined in paragraph (r).  FINRA Rule 12100(a).  Rule 12100(r), in turn, defines "person associated with a member" as follows:

> The term "person associated with a member" means:
>
> (1) A natural person registered under the Rules of FINRA; or
>
> (2) A sole proprietor, partner, officer, director, or branch manager of a member, or a natural person occupying a similar status or performing similar functions, or *a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member*, whether or not any such person is registered or exempt from registration with FINRA under the By-Laws or the Rules of FINRA.
>
> For purposes of the Code, a person formerly associated with a member is a person associated with a member.

FINRA Rule 12100(r) (emphasis added).  Gilbert is clearly a natural person, engaged in the investment banking or securities business.  To find that Gilbert is a person associated with

Waterford pursuant to Rules 12100 and 12200, this Court must find that Waterford directly or indirectly "controlled" Gilbert.

With respect to its denial of control over CBS or Gilbert, Waterford must, in effect, prove a negative.  In that regard, the Court notes that Waterford's claims tend to be only conclusory in nature.  For example, in its Complaint, Waterford asserts that it "is not and never was in control of or controlled by CBS.  Waterford does not possess and never did possess, directly or indirectly, any power to direct or cause the direction of the management and policies of CBS, by contract or otherwise."  (Compl. at ¶ 12.)[6]  Seeking summary judgment, Waterford now claims that it "played no role whatsoever in CBS' decision to terminate its registration with FINRA," and asserts that Waterford and CBS filed separate tax returns and made separate disclosures and filings with FINRA and the SEC.  (Pl.'s Br. at ¶¶ 22-23.)  Waterford further asserts that it "did not help create, manage, market or sell any of CBS' products.  Waterford and CBS entered into one (1) wholesale agreement relating to a private placement known as Evolution Capital, in which Waterford and CBS agreed to split a commission."  (Id. at ¶ 24.)

With respect to Gilbert, Waterford never explicitly denies that it had direct or indirect control over him, but Waterford does make a series of assertions in an attempt to establish that Waterford had no direct or indirect control over Gilbert.  Because Defendants do not contest the following assertions about Gilbert, the Court must consider them as undisputed facts.  Between April 30, 2004 and December 23, 2009, Gilbert worked exclusively for CBS pursuant to the terms of an Independent Associate Agreement with CBS.  (Id. at ¶ 34.)  During the time Gilbert

---

[6] In its Memorandum in Support of Summary Judgment (Pl.'s Br. ¶ 8), Waterford repeats the same claim, but cites Frank Wainscott's affidavit in support.  However, Wainscott's claim in his affidavit is similarly conclusory: "Waterford has never been in control of CBS; nor has it ever been controlled by CBS.  Waterford does not possess and never did possess, directly or indirectly, any power to direct or cause the direction of the management and policies of CBS, by contract or otherwise."  (Wainscott Affidavit, Docket No. 3, at ¶ 16.)

worked for CBS, his direct supervisor was James Mitchell ("Mitchell"), Chief Compliance

Officer of CBS.  (Id.)  During his time with CBS, Gilbert reported to Mitchell and Cindy

Freeland ("Freeland"), a CBS compliance manager who assisted Mitchell."  (Id.)

Gilbert did not become a registered representative with Waterford until early 2010.

Waterford's account of Gilbert's transfer from CBS is undisputed:

> On December 23, 2009, Gilbert received a telephone call from Richard E. Landi ("Landi"), an operations manager with CBS. It was mid-afternoon. Gilbert and his wife were in the car…in Oak Forest, Illinois…Landi told Gilbert that effective that day, CBS was closing. Landi stated that Gilbert (and others) would be offered a position with Waterford, if he wanted. It was Gilbert's choice. That was the first time that Gilbert had been offered or had considered being a representative with Waterford. Landi also stated that because FINRA was closed over the holidays, that, if Gilbert chose to go with Waterford, he would not be appointed until the New Year 2010. Landi indicated that Gilbert would need ACAT forms signed to work with his clients in the beginning of the New Year. Gilbert told Landi that he would accept the position, and that is how the telephone call ended.

(Pl.'s Br. at ¶ 57; see also Gilbert Affidavit at ¶ 34.)

On December 23, 2009, before assuming his new position as a registered representative

of Waterford, Gilbert manually changed the signature block of his business email to indicate that

he would be offering securities thereafter through Waterford.  (Gilbert Affidavit at ¶ 36.)  On

December 24, 2009, Gilbert sent the following email to one of the Defendants, Mary Borowiak:

> Mary, my Broker / Dealer is combining with their sister company and using the name of the sister company, Waterford Investor Services, and dropping the name of Community Banking Securities.  Because of this, I need the attached ACAT form signed as soon as possible.
>
> Please sign only the first page and fax…that signed first page back to me.  This will not change your account and there is no cost to you.
>
> Thank you and Merry Christmas,
> George J. Gilbert
>
> Gilbert Financial, Inc.
> Securities Offered Through Waterford Investor Services, Inc.

(Pl's Mot. Sum. J. at Ex. B-12, p. 40.)  Although at least some Defendants signed and faxed the blank ACTA (account transfer) forms back to Gilbert, apparently none of Defendants ever signed customer agreements with Waterford, or engaged in any transactions with Waterford.  (Gilbert Affidavit at ¶ 38; Pl.'s Br. at ¶ 62; Def.'s Br. Opp'n Pl.'s Mot. Sum. J. (Def.'s Opp'n") at ¶ 62.) In fact, Defendants transferred their accounts to other firms sometime after January 1, 2010. (Pl.'s Br. at ¶ 62).[7]

### iii.  Waterford Indirectly Controlled Gilbert

In determining whether Waterford directly or indirectly controlled CBS or Gilbert for purposes of applying FINRA Rule 12200, the Court remains especially cognizant of the liberal federal policy in favor of arbitration.  It is not necessary for the Court to address the question of whether CBS was indirectly controlled by Waterford, where the focus is on the relationship between Waterford and Gilbert, it being the conclusion of this Court that, pursuant to FINRA Rules 12100 and 12200, Gilbert is an associated person of Waterford and, therefore, Waterford is obligated to arbitrate with Gilbert's customers, i.e., Defendants.

The FINRA Code's definition of "associated person" is broad, and includes any "natural person engaged in the investment banking or securities business who is directly or *indirectly* controlling or controlled by a member."  FINRA Rule 12200.  The majority of Waterford's claims concerning Gilbert only undermine assertions of Waterford's *direct* control of Gilbert; however, the facts Waterford asserts are consistent with Gilbert nevertheless being under Waterford's *indirect* control.  The phrase "indirect control" can mean various things in different circumstances, and the FINRA Code is silent on any precise meaning the that phrase should have

---

[7] Defendants claim that there is at least one account that was not transferred from Waterford (Def.'s Opp'n at ¶ 62), but Waterford asserts that this is a dormant IRA account, and that no activity of any kind has occurred on this account since January 2010.  (Pl.'s Br. at 6 n.1.)

with respect to determining whether there is a duty to arbitrate.  Moreover, the FINRA Code does not specify the degree of indirect control required, including whether any indirect control must be substantial or something less.

One way of understanding the concept of indirect control in this context involves the delegation of authority and power.  For instance, a busy CEO might prefer to delegate authority over lower-level management to a Vice President of Operations, preferring to devote their time and energy to more "pressing" matters.  The CEO might even leave *all* decisions about the day-to-day activities of the managers to the Vice President of Operations, but in such a case the CEO would still be described as having indirect control over the managers.  Indeed, the most efficient delegation of power and authority can take the form of the controlling person being unaware of the particular activities of those under his or her indirect control.  As long as the controlling person retains the *power and authority* to control another, that is enough to establish indirect control.

In support of its assertion that it had no control over CBS, Waterford references Title 17 of the Code of Federal Regulations, which deals with commodity and securities exchanges. (Compl. at ¶ 12.)  Specifically, Waterford refers to § 230.405, which defines various terms, including "control": "The term control (including the terms controlling, controlled by and under common control with) means the possession, direct or indirect, of *the power* to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, *or otherwise*."  17 C.F.R. § 230.405 (emphasis added).  The Court notes that the definition offered by Waterford does not indicate that power must actually be *exercised* in order for there to be indirect control.  It instead defines control in terms of the

possession of the *power* to direct or cause the direction of a person, which actually supports the conclusion that Waterford had indirect control over Gilbert.

Moreover, in interpreting similar language regarding direct and indirect control in § 20(a) of the Securities and Exchange Act, courts have held that, for there to be indirect control, the controlling party need only to have the power and ability to exercise power.  There is no requirement that the power actually be exercised.  See e.g., STMicroelectronics v. Credit Suisse Group, No. 08 CV 3201, 2011 WL 1238817, at *6 (E.D.N.Y. March 31, 2011) ("For purposes of 20(a) liability, 'actual control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof.'") (quoting Dietrich v. Bauer, 126 F. Supp. 2d 759, 765 (S.D.N.Y. 2001) (quoting Sanders v. Gardner, 7 F. Supp. 2d 151, 163 (E.D.N.Y. 1998)).  Such precedent is especially significant in light of the liberal federal policy in favor of arbitration and the Fourth Circuit's directive that, in interpreting the scope of an arbitration agreement, all doubts and ambiguities are to be resolved in favor of arbitration.  In this regard, such direct/indirect control language in a non-arbitration, securities-law context illustrates how indirect control may nevertheless manifest itself in the form of mere *power* to control.  Although the undisputed facts in this case do not support a clear inference of Waterford's actual *exercise* of power and control over Gilbert, it is undeniable that Waterford retained the *power and ability* to exercise power over his actions.

Waterford also attempts to minimize the relationship between itself and CBS, emphasizing that Waterford and CBS had different minority owners (Pl.'s Opp'n at ¶ 4) and at least some different "control" persons:

> Between 2003 and 2009, Waterford and CBS had different control persons, including different chief compliance officers, and some different officers. Williams H. McFaddin ("McFaddin") was chairman of the board of CBS, but was

24

> never affiliated with Waterford. Wainscott [one of two officers in charge of the day-to-day operations of Waterford] was never employed by CBS. James M. Mitchell ("Mitchell") was Chief Compliance Officer for CBS, but never worked for Waterford. John B. Guyette ("Guyette") was an officer and director of CBS, but was never affiliated with Waterford.

(Id. at ¶ 9.)  Waterford also emphasizes that AIC, the parent of both CBS and Waterford, had, at the time in question, its own board of directors, only two of whom had a direct relationship with both CBS and Waterford.  (Id. at ¶ 11.)

Despite Waterford's attempt to minimize its relationship with CBS and, by implication, its exercise of control over Gilbert, the record reveals a significant degree of overlap in personnel and resource utilization, which would have given rise to myriad opportunities for Waterford's officers, directors, and managers to at least indirectly control Gilbert, thus making him an associated person of Waterford for purposes of FINRA Rule 12200.  Waterford currently has two directors, Frank Wainscott ("Wainscott") and Nicholas Skaltsounis (Slaltsounis), and between 2006 and 2010 Paula Ann Collier ("Collier") served with Wainscott and Skaltsounis as a third director.  (Compl. at ¶ 2).  Wainscott and Roger Leibowitz ("Leibowitz") are currently responsible for the day-to-day operations of Waterford.  (Id. at ¶ 3.)  A number of officers and employees of CBS in 2009 were also officers and employees of Waterford at the same time in 2009:

> (a) Leibowitz was the Chief Operating Officer and Executive VP of Waterford, a Vice President of CBS, and a Vice President of AIC, Inc.

> (b) Skaltsounis was the Chairman of the Board of Directors of Waterford, Secretary/Treasurer of Waterford, President of CBS, and a Director of AIC, Inc.

> (c) Collier was an Executive Vice President of Waterford and an Executive Vice President of CBS.

> (d) Franklin Flanary was the Chief Financial Officer of Waterford and the Chief Financial Officer of CBS.

25

(e) Lawrence Barnes was a Vice President of Waterford and a Vice President of CBS.

(f) Landi was the Vice President of Operations for Waterford and Vice President of Operations for CBS.

(Def.'s Br. at ¶ 12[8];  Waterford 30(b)(6) Dep., Docket No. 19, Ex. 3, ("Leibowitz Dep.") at 5, 6, 18, 20-22, ("Landi Dep.") at 4-5; Resp. Req. Adm., Docket No. 19, Ex. 1-2 at ¶¶ 15, 16.) Defendants also identify additional individuals who were employees of both Waterford and CBS in 2009: Cindy Freeland (Compliance) ("Freeland"), Jane Whittemore (Operations), Katie Lester (Fixed Income Sales), LuCinda Hanayik (Accounting), Mark Tomko (Operations), and Pete Barnes (Compliance Audits/AML).  (Def.'s Br. at ¶ 14; Leibowitz Depo. at 25-26.)

Leibowitz, Skaltsounis, Collier, Flanary, Barnes, and Landi were all employed in a suite of Richmond, Virginia offices shared by Waterford and CBS in 2009.  (Leibowitz Dep. at 20-22); Landi Dep. at 5.)  In 2009, a significant portion of Leibowitz's work was for Waterford, but his salary was paid by CBS. Waterford subsequently paid Leibowitz's salary in 2010. (Leibowitz Dep. at 26, 38.)  In 2009, CBS and Waterford occupied the same large office suite in Richmond. (Resp. Req. Adm. at 34.)  At the same time, there was no division between the offices of the different firms in the suite. The suite was the main office of CBS, and the majority of Waterford's administrative employees occupied the suite. Waterford only had four administrative employees in its main office in Florida in 2009, but it had at least eight administrative employees in the shared Richmond offices during the same period. (Leibowitz Dep. at 10, 38-39.)  CBS and Waterford also shared a trading desk in the Richmond office suite. (Compl. at ¶ 32.)

---

[8] See footnote 3, *supra*.

The overlap in officers, directors, employees, and offices of Waterford and CBS in 2009 were extensive.  However, for purposes of establishing Waterford's indirect control over Gilbert, it is sufficient to focus on just a handful of undisputed facts.  First, Waterford admits that Gilbert's immediate supervisors at CBS were CBS's Chief Compliance Officer, Mitchell, and Freeland, a CBS compliance officer working directly under Mitchell.  (Pl.'s Br. at ¶ 34.)  But Freeland also occupied a similar position at Waterford at the same time, giving her superiors at Waterford ample opportunity to indirectly control Gilbert through Freeland.  Second, although Mitchell was never an employee of Waterford, Mitchell was, at CBS, subordinate to Skaltsounis. In turn, Skaltsounis was President, CEO, and CFO of CBS *and*, simultaneously, was one of three directors at Waterford.  Significantly, he served as Chairman of the Board of Waterford between 2003 and 2009.  (Pl.'s Opp'n at ¶ 6.)  As a result, the controlling members of Waterford were vested with indirect control of Gilbert through Mitchell.  Finally, a second of the three directors of Waterford in 2009, Collier, was also Executive Vice President of CBS at that time, thus having ample opportunity to exercise indirect control over Gilbert through Freeland, if not also Mitchell.  (Compl. at 7 n.3.)

FINRA Rule 12200 requires a member to arbitrate with the customer of an associated person.  In light of FINRA 12100's definition of "associated person," Gilbert is an associated person by virtue of Waterford's indirect control over him.  Thus, Waterford has a duty to submit to FINRA arbitration with Defendants, who were Gilbert's customers.  Such a conclusion furthers the liberal federal policy in favor of arbitration, as embodied in the Federal Arbitration Act, and is compliant with the Fourth Circuit's directive to resolve all doubts and ambiguities in

favor of arbitration when determining the scope of an arbitration agreement.  Accordingly, the Court recommends dispositive relief in Defendants' favor on such a basis.

**B.      Defendants' Appeal to Successor-in-Interest Theory**

As an alternative to their argument based on the FINRA by-laws, Defendants argue that Waterford is a successor-in-interest to CBS, as defined by Virginia state law and, as such, it is obligated to submit to FINRA arbitration with CBS's customers.  Defendants appeal to two distinct concepts in support of their successor-in-interest claim: *de facto merger* and *mere continuation*, though they do not clearly distinguish between the two concepts; rather, they simply claim that the factors required for *de facto* merger and continuation are present in the case.  (Def.'s Br. at 16.)  In resisting Defendants' successor-in-interest claim, Waterford emphasizes that it and CBS observed corporate formalities during the time in question, and Waterford insists that it and CBS  always operated as two separate and distinct companies. Waterford also appeals to an Eleventh Circuit decision, Wheat, First Securities, Inc. v. Green, 993 F.2d 814 (11th Cir. 1993), which it claims is dispositive of the issue.  (Pl.'s Reply Br. Sup. Mot. Sum. J. ("Pl.'s Reply") at 3.)

Aside from the fact that the case is from another Circuit, this Court finds that Wheat, First Securities is factually distinguishable.  The Court also distinguishes between Defendants' *de facto* merger and continuation claims, rejecting Defendants' *de facto* merger claim, but accepting their argument regarding "continuation."

The parties agree that Virginia law governs on the question of successor-in-interest. (Def.'s Br. at 13; Pl.'s Opp'n at 7 n.2.)  Under Virginia law, a corporation that acquires the assets of another corporation does not automatically succeed to the predecessor's liabilities.  Rather,

28

successor liability arises under only four circumstances: (1) the purchasing corporation expressly or impliedly assumes the predecessor's liabilities; (2) the transaction amounts to a consolidation or merger, including a *de facto* merger of the seller and purchaser; (3) the purchasing corporation was a mere continuation of the selling corporation; or (4) the purchase transaction was fraudulent and was made in order to escape obligations.  Harris v. T.I., Inc., 413 S.E. 2d 605, 609 (Va. 1992); Royal Alliance, 587 F. Supp. 2d 729, 738.  Defendants make no claims regarding (1) or (4), and instead rest their successor-in-interest claim on (2) "*de facto* merger" and (3) "mere continuation."

### 1.     *De facto* **Merger**

Although Virginia courts recognize the notion of a *de facto* merger, the Supreme Court of Virginia has never defined the doctrine, or clearly distinguished it from a mere continuation of business interests.  However, in Blizzard v. National Railroad Passenger Corp., this Court offered an analysis of the concepts, distinguishing *de facto* merger from mere continuation.  831 F. Supp. 544 (E.D. Va. 1993).  Appealing to what it understood to be the "traditional view," the Blizzard court identified the following elements of a *de facto* merger: (1) a continuity of the selling corporation's enterprise, including continuity of management, personnel, physical location, assets, and general business operations; (2) a continuity of ownership because the purchasing corporation acquires the assets with shares of its own stock, which ultimately are held by the selling corporation's shareholders; (3) prompt liquidation and dissolution of the selling corporation's business operations; and (4) an assumption by the purchasing corporation of the selling corporation's obligations necessary for normal operations of the seller's business. Blizzard, 831 F. Supp. at 547.

In the present case, Waterford and CBS fail to satisfy element (2) of a *de facto* merger, because there is no evidence that any stock was ever transferred between the companies. Indeed, Waterford claims that CBS shareholders never received Waterford stock (Pl.'s Opp'n at 10), and Defendants have not proven otherwise. Moreover, the <u>Blizzard</u> court held that in the absence of a sale or transfer of stock, there can be no *de facto* merger, though there was a transfer of both machinery and personnel in <u>Blizzard</u>. 831 F. Supp. at 547. ("'Absent a transfer of stock, the nature and consequences of a transaction are not those of a merger.'") (quoting <u>Travis v. Harris Corp.</u>, 565 F.2d 443, 447 (7th Cir. 1977)). <u>See also</u> <u>Crawford Harbor Assoc. v. Blake Const. Co., Inc.</u>, 661 F. Supp. 880, 884 (E.D. Va. 1987) ("'The essential characteristic of a *de facto* merger is the succession of the selling corporation's stockholders to stockholder status in the purchasing corporation'") (citation omitted).[9] Accordingly, the Court recommends that Defendants' Motion for Summary Judgment be denied on that particular basis.

## 2.    Mere Continuation

Although no *de facto* merger occurred, it is apparent from the undisputed facts that Waterford is but a "mere continuation" of CBS. The <u>Blizzard</u> court, relying on the Virginia

---

[9] Although this Court follows the <u>Blizzard</u> court's analysis of *de facto* merger, it notes that the more recent <u>Royal Alliance</u> decision adopted a somewhat different set of elements for a *de facto* merger: "(1) continuity of ownership; (2) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (3) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (4) a continuity of management, personnel, physical location, assets, and general business operation." <u>Royal Alliance</u> 587 F. Supp. 2d at 739 (quoting <u>Sweatland v. Park Corp.</u>, 181 A.D.2d 243 (N.Y. App. Div. 1992)). Because there was some uncertainty in the <u>Royal Alliance</u> case with respect to whether Virginia or New York law applied, that court relied on a set of elements from New York case law, under the assumption that the two states' law was essentially the same on this issue. Because the parties in the present case agree that Virginia law applies, this Court will rely on the <u>Blizzard</u> analysis. However, the Court also notes that, utilizing the <u>Royal Alliance</u> analysis, it would likely find a *de facto* merger between CBS and Waterford. The key difference between the <u>Royal Alliance</u> and <u>Blizzard</u> approaches is that the former does not require a transfer of stock to find a *de facto* merger.

Supreme Court's decision in Harris v. T.I., Inc., 413 S.E.2d 605 (Va. 1992), identified a number

of factors relevant to determining whether one company is a mere continuation of another.  First,

the court identified as the "key element" of the inquiry whether there is a common identity of the

officers, directors, and stockholders in the selling and purchasing corporations.  Blizzard 831 F.

Supp. at 548; Harris, 413 S.E.2d at 609.  "Among these three factors (officers, directors, and

stockholders), it appears that identity of ownership is the most important component to sustain a

finding of 'mere continuation.'"  Blizzard, 831 F. Supp. at 548.  In the present case, identity of

ownership is undisputed, since at all relevant times, CBS and Waterford have both been

majority-owned by the same company – AIC, Inc.  See Crawford Harbor Assoc., 661 F. Supp. at

885 (noting that the mere continuation exception requires that the "legal and economic

ownership be essentially the same both before and after the transaction").

The Court further notes that nowhere does Virginia precedent suggest that there must be

an absolute identity between the companies for there to be a mere continuation.  All that is

needed is a common identity of management, operation, and ownership.  According to the Fourth

Circuit, in applying the "mere continuation" exception, "absolute identity between the companies

is not required. Virginia precedent simply does not create that standard, but instead calls for

common identity of management, operation and ownership."  Halsey v. Urban Telecomms.

Corp., No. 90-1298, 1996 WL 482682, at *3 (4th Cir. Aug. 27, 1996).  See Harris, 413 S.E.2d at

609.  The Court has already discussed, in considering whether Gilbert was indirectly controlled

by Waterford, the extensive overlap between Waterford and CBS with respect to directors,

managers, and officers.  That degree of overlap is sufficient to satisfy the first factor of "mere

continuation."  Also relevant is the two companies' extensive sharing of office space and

resources in the Richmond office suite.  See Blizzard, 831 F. Supp. at 548.  Although Waterford

attempts to minimize the degree of overlap between itself and CBS (Pl.'s Br. at 22), the Court is

satisfied that there was sufficient overlap during the time in question to establish a common

identity of management, operation, and ownership.

Another factor of the "mere continuation" analysis is whether there exists one corporation

following the transaction.  Blizzard, 831 F. Supp. at 548.  Although CBS still exists as a

corporation, it no longer transacts any business.  The Blizzard court found in an analogous case

that mere continued legal existence does not defeat the factor.  Id. at 548-49.  Because CBS

continues to exist as a legal entity in name only, the factor weighs in favor of finding that

Waterford is a "mere continuation" of CBS.  Id. at 549 ("[t]he mere fact that Sears Concrete

continued to exist after transferring its assets, employees, and good will to Sears Contracting

does not preclude a finding that Sears Contracting is the mere continuation of Sears Concrete").

Accordingly, the Court recommends that Waterford's motion for dispositive relief be denied on

that basis, and that Defendants' motion therefore be granted.

In opposing such a conclusion, Waterford relies on Wheat, First Securities Inc., 993 F.2d

814 (11th Cir. 1993), describing the case as "on point."  (Pl.'s Reply at 3.)  In that case, the

Second Circuit Court of Appeals refused to accept the Appellants'/investors' proposal that

customer status for purposes of NASD arbitration be determined at the time the arbitration

complaint is filed, regardless of the past relationship, or lack thereof, between the investor and

the NASD member: "We believe that the rule preferred by Appellants would do significant

injustice to the reasonable expectations of NASD members.  We cannot imagine that any NASD

member would have contemplated that its NASD membership alone would require it to arbitrate

claims which arose while a claimant was a customer of another member merely because the claimant subsequently became its customer."  Wheat, First Sec., 993 F.2d at 820.

Although the Court sympathizes with the due process concerns of the Wheat, First Securities court, there are substantial differences between that case and the present case.  In Wheat, First Securities, the claimants were customers of a Mr. Thackston, who was an agent of Marshall Securities, and subsequently an agent of Wheat First.  While an agent of Marshall, well before he had any relationship whatsoever with Wheat First, Thackston made material misrepresentations to claimants with respect to an investment purchase.  Sometime later, long after the alleged wrongdoing, Wheat First purchased some of Marshall's assets and assumed certain of its contracts.  Id. at 816.

There are two significant differences between the Wheat, First Securities case and the present case.  First, there was no relationship at all between Marshall and Wheat First before the purchase agreement, Wheat, First Sec., 993 F.2d at 818, whereas the interrelationships between Waterford and CBS over time are well documented, as has been discussed in earlier parts of this report and recommendation.  Thus, Thackston was not "associated" with Wheat First at a time contiguous with the accrual of a claim, as is the case for Waterford and Gilbert.

Second, when Wheat First signed the Asset Purchase Agreement, by which it acquired certain assets and liabilities of Marshall, it "expressly did not 'assume any liability, known or unknown, fixed or contingent, of [Marshall Securities'] except for [Marshall Securities'] liabilities and obligations under the Contracts' that were specified in an exhibit to the agreement. Appellants' customer agreements with Marshall Securties were not included among the identified 'Contracts' specified in that exhibit to the Asset Purchase Agreement."  Wheat, First

33

Sec., 993 F.2d at 816.  Unlike Wheat First, Waterford had no explicit agreement between itself and CBS specifying that Waterford was not assuming CBS's duty to arbitrate pursuant to its FINRA membership.  The lack of an explicit agreement, combined with CBS's history of shared officers, directors, employees, and office space, distinguish Wheat, First Securities from the present case.

The Court also notes some inconsistencies, or confusion, in Waterford's pleadings and related documents regarding the question of whether it ever provided consideration for CBS's assets.  For instance, in its Opposition Brief, Waterford states the following:

> After CBS terminated its registration with FINRA, Waterford assumed responsibility for (and paid) certain support services and fixed expenses, *e.g., Bloomberg terminals, internet, cable, office supplies, etc.,* that were once paid by CBS or AIC.  Waterford did not purchase these items from CBS.  Rather, Waterford voluntarily assumed and paid the existing obligations. Waterford's bona fide payment of valuable consideration for existing support services negates any finding of "mere continuation" and successor liability. *Harris*, 243 Va. at 70, 413 S.E.2d at 609 (when the purchase of all the assets of a corporation is a bona fide, arm's-length transaction, there "mere continuation" exception does not apply and there can be no successor liability)[.]

(Pl.'s Opp'n at 9; see also Pl.'s Br. at 22-23.)

Waterford is correct that the acquisition of another company's assets for adequate consideration is evidence of an arm's-length transaction, and, to that extent, undermines any continuation claim.  However, consideration must be paid to the company *from whom the assets are being acquired*, and Waterford admits here that it paid no consideration to CBS.  The only consideration being paid in this scenario would be the money paid to the providers of "Bloomberg terminals, internet, cable, office supplies, etc.," not to CBS.  Therefore, the fact of

Waterford's assumption and payment of CBS's bills does not undermine a mere continuation claim.[10]

Finally, this Court notes that Waterford asserts that it could not be the successor-in-interest of CBS because Waterford was created before CBS, and that the two entities existed and operated separately for over seven years.  (Pl.'s Br. at 22.)  The Court has already considered the latter circumstance and found it either conclusory or non-dispositive.  It is undisputed that Waterford was in existence before CBS, but the Court sees no reason why a newer company cannot be the continuation of an older company.  The elements of continuation identified by the various courts do not mention such a requirement, and Waterford cites no legal authority for the proposition.  Accordingly, finding Waterford's arguments to the contrary unpersuasive, the Court concludes that Waterford was a mere continuation of CBS and, therefore, recommends that Defendants' Motion for Summary Judgment be granted on this additional basis.

## IV. CONCLUSION

In conclusion, and for the reasons discussed herein, it is the recommendation of this Court that the Defendant's Motion for Summary Judgment (Docket No. 18) be GRANTED, and that the Plaintiff's Motion for Summary Judgment (Docket No. 16) be DENIED.

Let the Clerk file this Report and Recommendation electronically and forward a copy to the Honorable Robert E. Payne, with notification to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within**

---

[10] This Court also notes that such an acquisition of another company's obligations satisfies the second element of the Royal Alliance court's analysis of a *de facto* merger: "(2) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor."

**fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a <u>de novo</u> review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____/s/_____

Dennis W. Dohnal
United States Magistrate Judge

Richmond, Virginia
Dated: July 29, 2011